Good morning. Happy New Year to all, whether you're accountants or appellees. We have five cases on the calendar this morning. Three patent cases, two government employee cases, the latter are being submitted on the briefs and will not be argued. First case is Smith & Nephew v. Arthrex. 2014-1691. And we'll hear from Mr. Sabre. Thank you, Your Honor. Happy New Year and may it please the Court. This appeal has two basic parts. The first is whether Arthrex should be able to raise invalidity issues that are directly related to the lodging construction issued by this Court in S&N 2, the last appeal that was here. And then there are issues relating to damages, which now amount to approximately $100 million in this case. With respect to the first issue, I think you have a decent argument that the claim construction was changed. But what I'm having difficulty with is the question of whether that change had any effect on the prior art that you were relying on. In other words, did the change make a difference? And you don't say much about the new prior art that you were relying on and the old prior art, which was considered by the District Court. It doesn't seem to turn on this supposed difference in the claim construction. Could you address that? Sure, please. I'd be happy to. We believe when the case was before Judge Motsman back in 2007 when he was deciding invalidity, the way the parties had treated the issues and the way the case had been litigated was really very consistent with that an anchor had to stay in the hole until it can do it. And that's the way invalidity was decided in deep lodging in several cases. I'm not seeing that the prior art was being distinguished on the question of whether it could stay in or not stay in through the entire surgery. I don't think that there is a specific holding by the court with that. Several of the references that were before the court did go to the lodging question. And so we have to drop back to the fact that this is the way the parties had litigated the case of what lodging meant at that point. Now we get to the new construction or the construction issued by the court in the last appeal where it said now that the anchor need only stay in the hole when first put in. It didn't really matter if it could stay in to do its job. And so that opened up a whole new type of prior art. A type of prior art where by resilience an anchor or device would just stay in the hole when first placed in the hole but then something else would have to happen so it would stay in the hole throughout its intended purpose. So that was the prior art that we looked for specifically in light of this court's claim construction and I think we had six or seven different pieces of prior art. What's your best example of a piece of prior art that wasn't asserted the first time around because of the claim construction? Sure, I think probably the single best one is the 717 patent. That was a medical device which taught resilient fingers that gripped the side of the bone hole when you put it in so it would stay in when you just put it in. But then you had another device that expanded out the fingers so that it would stay in the hole more securely and therefore it could do its entire job. And this is exactly the kind of prior art that under the prior construction would not have been appropriate but under the construction issued by this court we believe would have been appropriate. Now, in all fairness, it's not a 102, it's a 103 reference. It would have to be combined with the other things such as the Perthes reference that would lead to get an obviousness argument. But on the basic gut question, which is really what Cardiac Pacemakers is about, is it related to the broad construction, I think it's right on point. And there are several others that we believe meet that one but that was I think the single best one. I agree with Judge Dyke that Cardiac Pacemakers really does stand for the proposition. It's about the oldest proposition in patent law that you have to use the same construction for validity and infringement and here we have $100 million. It's important to make sure that we've done that and I think that's what's behind Cardiac Pacemakers. And I believe for the reasons we set forth in our brief that we have shown that there is the broad construction. Judge Mossman indeed told us that he believed that the forces of surgery construction which he thought was appropriate was the one that was consistent with the way the court had tried the case, the way the case had been tried before. And we understand of course this court ultimately disagreed with that. And so the issue of course then is was it, was invalidity decided under that more narrow construction. We believe that it was and then as I tried to explain to Judge Dyke that we put forth the kinds of prior art where we believe is now relevant and would lead to a finding of invalidity which hadn't been before. That's really the guts of my argument on Cardiac Pacemakers and with the court's indulgence I'd like to move on to the damage issues. The award of damages was $85 million in this case. $68 million of that went to the lost profits. Smith and Nephew went forward with its lost profits based upon a market that it, which essentially matched the features of its BioRaptor product with the Biosutratec by Arthrex. And because they did this they were able to create a market where right off the bat they had 80-90% of the market. And in fact it peaks at 100% of this market during the supplemental damage period. But where we believe that there was error. But the key question is whether the mandate of the second appeal precluded this lost profits issue even though it didn't say anything specific about it. And whether this case is like Latrim, right? Well that certainly is an issue. And we don't believe that the mandate issue should be an issue frankly at all in this case. What happened of course is Judge Mossman entered a jable in favor of the defense on both direct infringement and indirect infringement. And that's what was appealed by Smith and Nephew in their brief. In our response brief we just pointed out, and nothing more than this, said, oh by the way, if you happen to disagree with us, these issues of damages were never decided by the district court. And there really isn't any dispute about that. The district court never decided the damage issues post-trial before the appeal to this court. So that's all that was done. And indeed what this court said, it didn't, as you're right, of course you never directly address this, but what it said was simply we disagree with the party's arguments. The only one who actually made an argument about damages was Smith and Nephew, which made this cross appeal argument in their reply. And just said remand the case not inconsistent with the opinion of this court. The opinion of this court, of course, went to the issues of direct infringement and indirect infringement and said nothing directly about damages. So we don't believe that in that circumstance that Latrim really kind of answers this question. There's no requirement to cross appeal damages when it comes up this way. Because there was no decision about that. And there was no decision in this case about damages. That's the key thing. There was no decision by Judge Mossman on damages. So we're just like Latrim. If there had been a decision on damages, that might be a different story. But that's not what happened here. He made no discussion at all about the damage issues. So naturally that should be a live issue. And even if there were any doubt about this question, and frankly I don't think that there is. But if there were any doubt, the Telsec case, which basically says if you can read it different ways, then the mandate rule would not apply. I really don't believe that this court would have meant to preclude any consideration on the merits of a damage issue by just a comment like it made to say we reject the party's other arguments and remand the case for something that's inconsistent with, to take further action that's not inconsistent with this opinion. I think this court would have said more. But getting back to the merits of the argument. Grain processing sets forth the fact that you must do an economic analysis. You can't just set up a market. You have to show why it's right. You have to show how the market would have developed but for the infringing product. And very importantly in this case, you must take into account the actions of the alleged infringer. Because as this court said, infringers don't sit idly by. Smith and Nephew did not come close to meeting any of those requirements. They certainly completely ignored Arthrex. They take every sale. In fact, their expert testified, I don't have any idea what Arthrex would have done. He didn't consider it. He must consider it. And then the evidence that they put forward. They admit that their damage expert did no analysis. They say now he just relied on their marketing expert. But in their brief, all they point to in their marketing expert is he talked about the different characteristics and how in his view it creates a sub-market. There's no evidence that as this court has said in both Slimfold and in Smith-Klein, you have to show are these features the reason people make decisions. Is this the reason that people make the buy? They never even attempted to do that. The closest they got was in their technical expert, Dr. Dedock, who talked about how there are certain advantages of some of these features. But once again, the important piece is missing, which is why do buyers make that decision? They offered absolutely no evidence of that critical point. This court has said it's absolutely critical to do that. And the last point I'd like to make upon that is… What the surgeons want in the product and how there are certain things in this product that are different from various other products in the minds of surgeons, not in fact evidence of… I forget what language you used about why people buy these things. What drives sales and what specifically… Lots of things drive sales. Right. That's exactly right. That's why you have to study the market. Exactly for that reason. But why isn't the testimony out of the mouth of one of the horses enough? Well, first of all, it was a surgeon expert not doing what, for example, in laser dynamics, which I understand is a reasonable royalty case… Well, there are many ways to do this. Have we ever said that there needs to be… I don't know whether an economist is the right person or whatnot. Why not a customer and let the other side have another customer, namely a surgeon, come in and say, it makes no difference, I don't care whether it's a screw-in or it's got wings or anything like that. It's all the same to me. Well, there's two answers to your question, Your Honor. The first one, I think the closest that I've seen where this court has actually tried to deal with how you actually do it is in the laser dynamics case, albeit that's a reasonable royalty case, but it's asking the same question as what drives sales. It's saying that you've got to do it through market surveys or looking at the market literature or doing that kind of real analysis. And that's the closest that I find that actually sets what you really have to come forward. Beyond that, what this court has said in both Slimfold and in SmithKline is we understand that there are advantages. We understand that people might like advantages, but the fact that you like something… I mean, every ad tells you what they like, right? But the question is, is it really the thing that motivates purchasing? And it's on that very, very critical question, Your Honor, that I believe that Smith and Matthew offered absolutely nothing. That's all that is in this record, and we cite to the pages where this stuff is discussed in the record, and I think if you read through it, you'll see very, very little, in fact nothing, on the question of this is the reason why people make decisions. What kind of evidence did you put in on that subject? We put in lots of evidence on that subject. What was it? We put in evidence that, for example, insertion method simply doesn't matter, that the same surgeons use different products for the same surgeries, different insertion methods. We put that in through Dr. Warren, who had worked for, was involved in developing the BioRaptor, through our own witnesses, both our doctor witnesses as well as our marketing witnesses. Then we put in the testimony that shows that Smith and Matthew's own documents show that all of these anchors compete, and in fact, the very products that they considered most competitive to the Smith and Matthew product were two products that they took out of their market. It was the Arthrex FastPak and the Mytek Paneloc. These are the two products they said are the most competitive products with them, and yet they take it out of a market. Remind me what specifically your surgeon witness said, which strikes me as more on point than the other. Yeah, that was Dr. Greenleaf, and he testified about how different methods, or doctors use different methods, and Mr. Benevitz was the other person who testified how different methods are for the same surgeries are done all the time. And again, the evidence from Smith and Matthew's own documents, which show that for the same surgeries, they compete with products of very, very different methods. There's more. There's the evidence about what really motivates sales is surgeon education, brand loyalty, having a reputation in the market. Your time has expired, including your rebuttal time. We'll give you two minutes to rebuttal back. Thank you. So we do believe that that's where there's much stronger evidence. Thank you very much. Mr. Skinion. May it please the court. The first thing I want to deal with is the broadening claim issue here. Well, since we're just talking about the lost profits issue, let's start with that. That's fine. I'm troubled by the suggestion that the mandate in the second appeal forecloses the lost profits issue, and that by ordering the reinstatement of the jury verdict that somehow we suggested that the lost profits issue was still a viable issue. And how is this different from Leitrim in that respect? I mean, it seems to me that's pretty clearly in point, no? Well, it's different in this respect. The court's ruling on the Jamal post-trial motions was in fact that it denied their motion based on the claim construction that did go to the jury. And it said it would have reinstated the verdict based on that. Well, that same thing happened in Leitrim. Well, it's a little bit different than Leitrim here because basically when the judgment's entered, the judgment indicates that the Jamal motions are granted in part and denied in part. They didn't appeal on the denied in part, but there's another issue here that wasn't in Leitrim, and that's this, is that in their brief here, first in our brief, we had argued exactly what needs to happen on remand, that we are asking for that claim construction that went to the jury be reinstated and the jury verdict in its entirety be reinstated. They understood that. What does that have to do with lost profits? I'm not understanding how you're distinguishing Leitrim on the lost profits issue. Well, it comes out this way, is that basically what happens then is there's an argument presented to this court as to what the remand should be. And while Mr. Saber said, we made some comments on it, that's not quite right. If you look at appendix page 33367, that's their brief, wherein they included separate argument sections. Separate argument sections. What's the point? How are you distinguishing Leitrim? Well, I'm distinguishing Leitrim because there was an argument being made to this court here as to why, in fact, what should happen on remand. That doesn't exist in Leitrim. And this court makes a decision here, and it reinstates... Because they argued that the lost profits issue remained, somehow, that we addressed that? Yes. In their brief, they argued that lost profits remains. Their argument was, do not reinstate the verdict. Don't do that because lost profits remains. And this court reinstated the verdict. But isn't it reading rather a lot into the language, the jury verdict is reinstated, to do what I think you're saying,  post-trial motions, which usually take place, of course, in the history of the jury verdict, that were not addressed, either in the Court of Appeals or in the district court the first time, because it was unnecessary since the JML was of zero damages, that that language, the jury verdict is reinstated or closes consideration of that? Just language, reinstate the verdict, does not necessarily mean that other issues are foreclosed. Because the same thing happened in Leitrim. It did. But the reason this differs from Leitrim is that unlike Leitrim, there was an argument in this appeal as to what happens in remand. And this court rejected it, saying that, in the opinion, that all the other arguments being made are without merit. Reinstate the verdict. That's different from Leitrim. But that could easily be interpreted to mean the arguments essentially made on their merit as opposed to suggestions about the proper disposition once all the merit issues have been addressed. Well, it's not arguments, it's not comments on this. They made several arguments in their brief, in response to our brief, that were arguments. The police in the argument section. They did not ask us to decide the lost profits issue in the second appeal, correct? We did not, no. And they did not either. They did not. Nobody asked us to decide. So you're saying we went ahead and decided to anyone. No, I want to say procedurally you did. Procedurally you did. There's a ruling. JMOL is denied as to the verdict that was entered by the court which included lost profits. They didn't cross appeal and then they argue in the appeal, well, this is still an open question. How could they cross appeal? There was no ruling on the lost profits issue. Well, this court can, you can appeal on a cross appeal on issues that aren't exactly ruled on. And in particular, you can cross appeal issues that have never been ruled on? The case says that. The cross appeal issue here has been ruled on by the court when it said it would reinstate the jury verdict. It denied the motion. Therefore, it was ruled on. The judgment is what this court goes by by what the appeal encumbers. It says there's denials here of this JML motion. That's ruling by itself. The court doesn't have to put opinions in or write an essay as to why. But in fact, what has to happen is that there has to be a judgment on it. There's a judgment. It's denied here. And then the argument in the brief is that, whoa, he didn't actually say specifically why he denied it. But it's an open question on appeal. It denied what? The district court didn't rule on a lost profits issue? Well, their motion, they raised the JML motion as to lost profits. But as a practical matter, the court said if the jury verdict goes on the correct construction, which this court later confirmed, the verdict gets reinstated. It wasn't a part of the verdict that gets reinstated. The verdict gets reinstated. Are you talking now about what we said or what the district court said? No, what the district court said. Did the district court rule on the lost profits issue before the second appeal? Yes. Before the second appeal, I think it did, yes.  The language that... Where? It's in his transcript. Where? Page. I'll have to get that for you, Judge. It shouldn't come without knowing your records because we're going to ask you questions about it. I understand that. He says, but the ruling here that we're talking about here really deals with, you're dealing with two different things. You're dealing with what the court ruled on lost profits originally and what they argued on appeal as to what happens on remand. To contrast that case here, for example, with cardiac pacemakers, the appellee... I'm sorry, the appellant in cardiac pacemakers, the infringer argued that you broaden the claim construction... We're not talking... Are you shifting to the claim construction? No, I wasn't, but I was contrasting that with what happens  of the mandate of the court. And as a practical matter, in cardiac pacemakers, there was an argument made on appeal that meant that some issue was not, as agreed to by this court, was not disposed of on remand. Mr. Kent, do you want to refer to 35-554, the appendix where the court finds opinion and mandate here, foreclosed taking up of the lost profits issue? Yes, Your Honor. Yes, since you left something, I don't know whether... Well, I think that when he came back on remand, when, in fact, the judge did make a ruling on this, I think his ruling was that, yes, the mandate rule applies, and I would have granted the fact support the judgment to begin with. So, I think that is his ruling here, but that's on the remand, what happened after the remand. But this is his ruling after the remand, right? Yes. It wasn't the question. The question was, did he decide the lost profits issue before the second appeal? I'll answer it the best I can. By saying that he would have reinstated the jury verdict and denying that portion of the JMOL motion that they made. That's a rule. By entering a judgment that said their JMOL motions were denied in part, that's a rule. Where? Where's the rule? It's in the judgment. Show me. Don't ask us those. It's an imposition to ask you to show us where it is in the record. The record for his ruling at the trial, at the post-trial hearing, is 17-9-37. 17-9-37? Yes. And what language that? If you look at line 9, starting at line 9. Yeah, it says that I deny the motion for judgment as a matter of law in that particular theory. Right. The particular theory was the claim construction that went to the jury. Right, but not the lost profits issue. No, it says, in other words, I would uphold the jury's verdict on the claim construction presented to it, which we call Smith and Nethers construction. Yeah, but that's not addressing the lost profits issue. That's addressing what would happen if the claim construction that he was adopting were held to be wrong. It could be interpreted that way, yes. He doesn't say anything about lost profits. No, he never addresses lost profits in that theory. He never addresses it. So my time is running out. I'd like to turn to the broadening issue. Go ahead. After just addressing just two other things on the lost profits issue, is that the evidence that we put in was through a marketing man, a surgeon, Dr. Dedoc, who testified as to why surgeons are likely. And it wasn't a question of every sale going to us. It was a market subdivision that we created by the marketing expert. And that they didn't object to the trial. And so the evidence that we had included, among other things, which Mr. Saber didn't mention, was the following, is that Otrex had a suture anchor that was biodegradable and it was used for this particular type of surgery. So it wasn't particularly good for using orthoscopic surgery techniques to repair that. So what they did was they introduced the BioFastTac. That's the accused product that's accused of lost profits here. The BioFastTac has one major difference between the two, and that is it pushes in and stays in due to the resilience. It's the invention. And their sales took off. They didn't cannibalize sales of BioFastTac. They made a great deal of additional sales for surgeons who liked the push-in feature, the push-in feature, and  didn't      They didn't have to do this again. They didn't have to do this again. The court adopted a claim for lodging that was broader than it used in deciding invalidity. That's clearly not the case. This court decided invalidity and infringement  first trial, on the first appeal, on exactly the same issue. Tensioning is not part of lodging. Lodging is only when you first press it in. And this court decided both the infringement and the validity question exactly on that point, exactly with that construction. That's the exact construction this court approved in the last appeal. The only time that this tensioning issue comes up is when Arthrex raises it in the third trial in the sixth day and says the claim construction requires forces of surgery and that's measured by tensioning. That was never a construction used by any court in 2007 or this court in 2009. It was not a broadening construction that went to the jury. It is not a broadening  that this court adopted. And it is not different from what it used in deciding infringement and validity. And the reference that Mr. Kenyon gave in 2005 in this case is Bolski which is cited in the patent. It's on the front page of the patent. It's not something new. That concludes my time Mr. Kenyon. Mr. Sabre has a couple of minutes for rebuttal. I'll be very short  Sabre. First I just wanted to give the sites and the records to the surgeon testimony and the marketing testimony that people use all kinds of different insertion methods. Dr. Greenleaf is at A19198. Dr. Warren is at A19308 to 310. And Mr. Benevitz is at A19248 to 1956. And with respect to the evidence about Smith & Nephews documents as well as all the evidence from what market publications say about markets. What do you make of the point about the fast tack and how in your own experience it did not cannibalize the sales of the suture tack? Is that what we're talking about? Yeah. I found that very interesting. When I went back to look at the record on that, no Smith & Nephew witness, no witness at all, said anything about  suture tack. I don't care what reasons they were there for. I'm asking if they established the point. No. When you introduced the fast tack, your suture tack sales didn't diminish as a result. When the suture tack was the one that came in, it shows two anchors on that document. The bio corkscrew and bio fast tack. Those are the two other anchors that were bio anchors that Arthrex had. It shows the sales continuing to go way up for one, staying the same for the other. In fact, critically, when Mr. Troxell, Smith & Nephew's witness, was asked what impact did the suture tack have on the bio fast tack sales and the bio corkscrew sales, he said, I don't know. I haven't studied that question. That is the kind of record we have. That record reference is not in the transcript that we   but it's in the overall record that was submitted. It's an A-01-8817. I could supply that if the              the record was not in the transcript. That was an A-01-8817. I could supply that if the record was not in the